# IN THE UNITED STATES DISTRICT COURT FOR THE
## WESTERN DISTRICT OF MISSOURI
## SOUTHWESTERN DIVISION

PATRICK SHAWN MURPHY,      )
                                      )
        Plaintiff,           )
                                      )
        v.              )     Case No. 09-CV-3457-NKL
                                      )
MICHAEL J. ASTRUE,        )
Commissioner of Social Security,    )
                                      )
        Defendant.     )

## ORDER

Plaintiff Patrick Shawn Murphy ("Murphy") challenges the Social Security Commissioner's ("Commissioner") denial of his claim for disability insurance benefits. This lawsuit involves an application for disability insurance benefits under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 401-433, and under Title XVI for supplemental security income.

Murphy's initial application was denied, and he appealed the denial to an administrative law judge ("ALJ"). After holding administrative hearings, the ALJ found on June 30, 2009, that Murphy was not "disabled" as that term is defined in the Act. On October 3, 2009, the Appeals Council denied Murphy's request for review, rendering the ALJ's decision the final decision of the Commissioner. The Act provides for judicial review of a final decision of the Commissioner. *See* 42 U.S.C. §§ 405(g), 1383(c)(3).

Murphy argues that the record does not support the ALJ's finding that he was not

1

under a disability because the ALJ's conclusions were not based on the record as a whole. Because this Court finds no reversible error in the ALJ's decision, Murphy's Complaint [Doc. # 1] is denied.

## I.      Factual Background

The complete facts and arguments are presented in the parties' briefs and will be duplicated here only to the extent necessary.[1]  At the time of the hearing, Murphy was forty-four years old with a GED.  Some of Murphy's past jobs included gas station attendant, construction worker, shipping clerk, cashier, delivery driver, desk clerk, janitor, press operator, packer, and welder.  He held no single job for more than a couple of years.  Murphy claims that he became disabled on or about January 31, 2005, because of bipolar disorder, depression, a fractured skull, a broken neck, breathing problems, and asthma.

### A.      Medical Records

In December 2005, the Missouri Department of Corrections conducted an intake evaluation on Murphy after he was incarcerated for felony drug possession — he remained in prison until March 2007.  The intake evaluation report shows that he was in a stable mood and that his thought processes were organized and not delusional.  The next month, Murphy told the psychiatrist that he first received mental treatment at age sixteen after his parents died in a car accident.  Murphy also told the psychiatrist that he was easily distracted, inattentive, and hated talking to people.  The psychiatrist noted that at their meeting Murphy

---

[1] Portions of the parties' briefs are adopted without quotation designated.

appeared friendly, sociable, and showed no signs of confusion during the examination. The psychiatrist diagnosed bipolar disorder, methamphetamine dependence, a history of polysubstance abuse, and borderline personality disorder. He gave Murphy a global assessment of functioning ("GAF") score of forty-five.[2] He prescribed medications.

In February 2006, Murphy told the psychiatrist that he was sleeping well and felt much better than when first seen. He appeared relaxed and happy but not manic. He denied feeling anger or having violent or suicidal thoughts. The next month, Murphy told the psychiatrist about past problems with authority and difficulty with social interaction. He admitted that poor coping skills contributed to his drug use. The psychiatrist increased his GAF score from forty-five to sixty-four.[3]

Early in April 2006, Murphy reported difficulty relaxing, racing thoughts, poor sleep, anxiety, and hearing voices. Later that month, he told the doctor he was "doing OK." He reported good appetite and sleep and denied having hallucinations, delusions, suicidal thoughts, or problems with his medicine. In May 2006, Murphy again reported doing OK and the doctor noted that his bipolar disorder was in "good remission."

In June 2006, Murphy told the counselor that he had functioned relatively well during

---

[2] The GAF scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. A GAF of forty-one to fifty indicates serious symptoms or any serious impairment in social, occupational, or school functioning. *See Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. 1994) (DSM-IV-TR).

[3] A GAF of sixty-one to seventy indicates some mild symptoms or some difficulty in social, occupational, or school functioning, but that the patient is generally functioning well with some meaningful interpersonal relationships. *See id.*

the past month. He said he had stopped one of his medications two weeks earlier and that he kept busy with work but tended to keep to himself because he was paranoid of peers and prison staff. His mental examinations in June and July indicated that he was well-oriented and calm, displaying reality-based thinking and organized thought processes with no agitation or aggression.

Murphy stated that he wanted to be transferred close to his family, but he needed a better mental health rating to do so, which required him to stop taking his medications. In August 2006, Murphy said he had not taken his medications for the past few weeks. He said he was doing OK and did not want mental health services. The doctor stated that his bipolar disorder was in remission. The next month, Murphy was still off medication and said he was functioning well, keeping busy with work and exercise. In October 2006, Murphy continued to function well without medication.

In November 2006, Murphy completed the ninety-day refusal of services process. His mental health rating improved and no further mental health services were requested. That same month, Murphy fell headfirst eight to ten feet from a second-tier walkway onto a concrete landing, possibly because of a seizure. He fractured his skull and facial bones on the left side. The fall also caused degenerative changes in his cervical spine, although it was not broken. His neck strain was treated "conservatively," according to the medical report, with a collar, and anti-seizure medications were prescribed. At his follow-up appointment in December 2006, he had normal strength and reflexes and his neck was not tender. He was released to work with restrictions, assigned a bottom bunk, and was not to use sharp

instruments, ladders, or be in high places.

In February 2007, Murphy said that he had not had a seizure since November 2006. His strength and grip were normal. In March 2007, he reported increasing paranoia and began taking medications again. He was released from prison that month and moved in with his sister and brother-in-law.

Rhett McCarty, a psychologist, treated Murphy from April 2007 to July 2007. At their first meeting, Murphy said he could complete tasks in a timely manner. Dr. McCarty noted no bizarre behaviors but a depressive affect. Mental testing indicated intact remote memory, average thinking ability, low average intellectual functioning, mildly impaired social judgment, impaired concentration ability, impaired mental control, and poor thought processes. Dr. McCarty diagnosed schizoaffective disorder, anxiety disorder not otherwise specified, and personality disorder not otherwise specified, and gave him a GAF score of forty-six. He recommended medication and individual therapy. At subsequent meetings, Dr. McCarty worked with Murphy to develop healthy cognitive patterns and improve family relationships. At each meeting, Dr. McCarty noted that Murphy had improved. His GAF scores ranged from forty-six to forty-eight.

At follow-up appointments for his seizure disorder in May 2007 and November 2007, Murphy reported that he had not had a seizure since November 2006. His examination showed normal mood and affect, normal reflexes, and no motor or sensory deficits.

Tina Morgan, a psychologist, met with Murphy for therapy from October 2007 to June 2008. Dr. Morgan made no clinical findings and did not provide an opinion about Murphy's

condition.

In April 2008, Murphy fell about twelve feet from the top of a beer truck. He crushed his pelvic bone and fractured part of his spine. He underwent spinal surgery consisting of a fusion and a bone graft. After the surgery his legs were neurologically intact. A follow-up computed tomography (CT) scan showed good alignment of the spine. The doctor told Murphy to wear his back brace when out of bed and participate in activities as tolerated.

In May 2008, Suzanne King, a doctor, treated Murphy for his mental condition. Murphy told her he was feeling better. He had occasional panic attacks but fewer mood swings, fewer bad dreams, and no visions. Dr. King diagnosed bipolar disorder not otherwise specified. The next week, Murphy sought additional services. He demonstrated irritable mood and depressed affect. He was diagnosed with schizophrenic disorder, paranoid type, and drug dependence. He was given a GAF score of fifty-two.[4] In July 2008, Murphy told Dr. King he was doing well on medications. Dr. King noted that his daily activities were usually good, that his mood and affect leveled with medication, and that he was neither suicidal nor psychotic. In September 2008, Murphy demonstrated to Dr. King a very irritable mood and unstable affect. Dr. King noted racing thoughts and manic speech. She increased one of his medications.

In December 2008, Murphy hurt his back. The emergency room doctor reported acute lumbar myofascial strain and told Murphy to try to limit his lifting for the rest of the week.

---

[4] A GAF of fifty-one to sixty indicates moderate symptoms or moderate difficulty in social, occupational or school functioning. *Id.*

In January 2009, Steven B. Adams, a psychologist, examined Murphy. Murphy told Dr. Adams he felt misunderstood by family, regularly thought of suicide, and felt safe locked in his house. He appeared sad, discouraged, and withdrawn. He reported significant suspiciousness and hostility in social relationships but no significant antisocial behavior. He responded appropriately and consistently on the Personality Assessment Inventory. Dr. Adams diagnosed paranoid schizophrenia and major depressive disorder and assessed a GAF score of thirty. He concluded that Murphy would be unable to maintain employment where he had to maintain regular working hours, work with others, or complete tasks without significant interference from hallucinations, moodiness, or difficulties in concentration. Murphy met again with Dr. Adams for therapy in February 2009 and March 2009. He appeared depressed and expressed thoughts of death. He did not have a primary care doctor and was not taking psychiatric medication.

### B.    Murphy's Testimony

On May 12, 2009, Murphy appeared before Administrative Law Judge Linda D. Carter. He testified that he could not be hired because of his felony record and because he was a medical liability. He stated that he had a history of seizures but no longer had seizures while on medication. He also said that he had a complete right arm implant and could not fully use his right hand. Murphy testified that he suffered from headaches, and arthritis in his neck, skull, back, and pelvic bone. Although pain medication helped somewhat, he said the pain sometimes worsened to where he could not walk. He described his mental symptoms, including panic attacks, difficulty trusting others, paranoia, memory loss, loss of

math skills, and visual and auditory hallucinations. Murphy said he took medication for these symptoms. He also said he preferred to be alone.

### C.      Vocational Expert's Testimony

Cathy Hodgson, a vocational expert, testified in response to a hypothetical question posed by the ALJ outlining Murphy's age, education, work experience, and work-related limitations identical to those contained in Murphy's RFC. Hodgson testified that the hypothetical person described by the ALJ could perform representative occupations of general assembler and table worker.

## II.      The ALJ's Decision

ALJs evaluate disability claims through a five-step process:

> The claimant must show he is not engaging in substantial gainful activity and that he has a severe impairment. Those are steps one and two. Consideration must then be given, at step three, to whether the claimant meets or equals [an impairment listed in the regulations]. Step four concerns whether the claimant can perform his past relevant work; if not, at step five, the ALJ determines whether jobs the claimant can perform exist in significant numbers.

*Combs v. Astrue*, 243 Fed. Appx. 200, 202 (8th Cir. 2007) (citing SSR 86-8, 20 C.F.R. §§ 404.1520, 416.920). After describing this process, the ALJ found that Murphy was not disabled.

At step one, the ALJ determined that Murphy had not engaged in substantial gainful activity since January 31, 2005.

At step two, the ALJ determined Murphy was severely impaired by his history of schizoaffective disorder, seizure disorder, bipolar disorder, anxiety disorder, personality

disorder not otherwise specified, his history of polysubstance abuse and dependance, degenerative disc disease of the cervical spine with a history of cervical strain, his history of multiple fractures including the left orbital wall, pelvis, and compression fracture of L1, and his asthma.

At step three, the ALJ determined that Murphy did not have an impairment or combination of impairments that met or medically equaled one of the impairments listed in the regulations.

At step four, the ALJ found that Murphy was unable to perform past relevant work.

At step five, the ALJ determined that Murphy had the residual functional capacity (RFC) to perform no more than sedentary work with additional non-exertional limitations. To account for his mental impairments, he was to perform simple, repetitive, one, two, or three-step job instructions. If math was necessary, he was limited to simple addition or subtraction. He was to have no public contact, minimal contact with co-workers and supervisors, and no team work duties. To account for his physical impairments, he was limited to having an even surface on which to stand and walk, no exposure to extreme vibration, and he was to avoid significant unprotected heights, potentially dangerous moving machinery, and commercial driving. For his asthma, he was to work in a controlled climate free of dust, fumes, and lint, and have access to inhalers. The ALJ found that jobs consisting of such work existed in significant numbers in the national economy. Therefore, the ALJ found that Murphy was not disabled.

III.    Standard of Review

In reviewing a denial of disability benefits, this Court considers whether the ALJ's decision is supported by substantial evidence on the record as a whole. *See Travis v. Astrue*, 477 F.3d 1037, 1040 (8th Cir. 2007). "Substantial evidence is evidence that a reasonable mind would find adequate to support the ALJ's conclusion." *Nicola v. Astrue*, 480 F.3d 885, 886 (8th Cir. 2007). The Court will uphold the denial of benefits so long as the ALJ's decision falls within the available "zone of choice." *See Casey v. Astrue*, 503 F.3d 687, 691 (8th Cir. 2007). "An ALJ's decision is not outside the 'zone of choice' simply because [the Court] might have reached a different conclusion had [it] been the initial finder of fact." *Id.* (quoting *Nicola*, 480 F.3d at 886).

It is well-established that the ALJ carries the duty of fully and fairly developing the record. *See Nevland v. Apfel*, 204 F.3d 853, 857 (8th Cir. 2000) (citation omitted). This is true even where a claimant is represented by counsel. *Id.*

## IV. Discussion

Murphy argues that the ALJ erred because (1) the ALJ did not properly evaluate the credibility of Murphy's complaints that his impairments exceeded his RFC; (2) the ALJ did not properly consider the opinion of Murphy's treating doctor regarding his mental condition; and (3) additional evidence not considered by the ALJ warrants remand. This Court finds no reversible error in the ALJ's decision.

### A. The ALJ Properly Evaluated the Credibility of Murphy's Complaints.

Murphy argues that the ALJ improperly discredited his subjective complaints that his impairments exceeded his RFC. "Where adequately explained and supported, credibility

10

findings are for the ALJ to make." *Ellis v. Barnhart*, 392 F.3d 988, 996 (8th Cir. 2005) (quoting *Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000)). "A disability claimant's subjective complaints of pain may be discounted if inconsistencies in the record as a whole bring those complaints into question." *Gonzales v. Barhnart*, 465 F.3d 890, 895 (8th Cir. 2006). The ALJ "must give full consideration to all of the evidence presented relating to subjective complaints," including observations by third parties and treating and examining physicians relating to matters such as: (1) daily activities; (2) duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness, and side effects of medication; and (5) functional restrictions. *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984).

Murphy contends that the ALJ acted improperly by considering her own observations during the hearing in evaluating the credibility of Murphy's allegations. The ALJ noted in her decision that Murphy answered questions clearly and logically at the hearing and did not display outward signs of severe mental or physical distress. In *Johnson v. Apfel*, where the ALJ had noted the claimant's lack of a stutter or other difficulty communicating during the proceedings, the court held that "personal observations of the claimant's demeanor during the hearing is completely proper in making credibility determinations." 240 F.3d 1145, 1147-48 (8th Cir. 2001). Murphy cites to *Reinhart v. Sec'y of Health & Human Servs.*, where the court held that "the ALJ is not free to reject the claimant's complaints of pain solely on the basis of the personal observations made of the claimant during the hearing." 733 F.2d 571, 573 (8th Cir. 1984).

The ALJ based her credibility determinations not solely on her own observations at the hearing, but gave full consideration to the evidence of Murphy's physical and mental impairments. The ALJ considered in detail the injuries he received from his fall in November 2006 and his subsequent recovery. Likewise, the ALJ considered his April 2008 fall and recovery and his December 2008 back injury. The ALJ also gave full consideration to Murphy's history of mental issues and treatment, including the *Polaski* factors. The ALJ did not err in evaluating the credibility of Murphy's complaints.

**B.      The ALJ Properly Considered the Opinion of Murphy's Treating Doctor Regarding His Mental Condition.**

Murphy argues that the ALJ impermissibly made her own medical or psychological conclusions by giving little weight to the GAF score given by his treating physician, Dr. McCarty. "The ALJ may reject the conclusions of any medical expert . . . if they are inconsistent with the record as a whole." *Pearsall v. Massanari*, 274 F.3d 1211, 1219 (8th Cir. 2001). The ALJ is tasked with resolving conflicts among the opinions of treating and examining physicians. *Id.*

The ALJ gave little weight to the GAF score provided by Dr. McCarty because the score was inconsistent with Dr. McCarty's notes. Although Dr. McCarty's notes showed steady improvement in Murphy's psychological condition with each visit, Murphy's GAF score did not rise to a corresponding extent, remaining in the range of forty-six to forty-eight. The GAF score was just one element of Dr. McCarty's evaluation, and the ALJ was entitled to consider the score in conjunction with Dr. McCarty's notes and other records before the

ALJ. Additionally, treating or examining physicians gave Murphy a fairly wide range of GAF scores at various points, and the ALJ acted within her discretion in resolving any possible conflicts among the opinions these scores represented. The ALJ was justified in attaching little weight to the GAF score given by Dr. McCarty.

### C. Murphy's Additional Evidence Does Not Warrant Remand.

Murphy argues that additional evidence attached to his brief warrants remand for further agency consideration. This evidence consists of a vocational evaluation report dated June 18, 2009. Murphy states that the report did not become available to him until August 6, 2009, and thus it could not have been brought before the ALJ prior to her June 30, 2009, decision. 42 U.S.C. § 405(g) generally precludes consideration on review of evidence outside the record before the commissioner during the administrative proceedings. *See Jones v. Callahan*, 122 F.3d 1148, 1154 (8th Cir. 1997). Remand is appropriate only when new evidence is material and there was good cause for failure to incorporate that evidence into the record before the Commissioner. *Id.* To be material, the evidence must be "non-cumulative, relevant, and probative of the claimant's condition for the time period for which benefits were denied." *Id.*

The vocational expert report contains a determination that Murphy was not ready to work at that time because of attendance problems, inappropriate sexual advances, and not taking his medicine. Counseling, therapy, and medication compliance was recommended for sixty days minimum. This report is cumulative with the other evidence of record and consistent with the ALJ's findings, particularly the RFC restriction to no public contact,

13

minimal contact with coworkers and supervisors, and no team work duties. The counselor's physical limitations were less restrictive than the RFC.

Also, Murphy has not shown good cause for failing to submit the new evidence into the record before the Commissioner. He has not provided any facts to support his assertion that the report did not become available to him for more than six weeks after it was completed. Furthermore, even if he did not receive the report until after the decision of the ALJ, he fails to explain why he apparently did not inform the ALJ of the existence of the report — or facts that precluded him from so informing the ALJ — even though the report was completed prior to the decision. The additional evidence supplied by Murphy does not warrant remand.

## V.    Conclusion

Because this Court finds no reversible error in the ALJ's decision, Murphy's Complaint [Doc. # 1] is DENIED.


   s/ NANETTE K. LAUGHREY
NANETTE K. LAUGHREY
United States District Judge

Dated:  July 12, 2010
Jefferson City, Missouri